463 F.2d 818
 80 L.R.R.M. (BNA) 2313, 149 U.S.App.D.C. 415,
68 Lab.Cas. P 12,666
 ARTHUR L. MORGAN UNION, LOCAL NO. 3, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, American Beef
Packers, Inc., Amalgamated Meat Cutters and
Butcher Workmen of North America,
AFL-CIO, Local Union No. 641,
Intervenors.
 No. 71-1102.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Jan. 14, 1972.
Decided May 9, 1972.
 
 Mr. George G. West, Des Moines, Iowa, for petitioner.
 Mr. Michael S. Winer, Atty., N.L.R.B., of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom Messrs. Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent.
 
 
 1
 Mr. Charles E. Sykes, Memphis, Tenn., with whom Mr. William A. Harding, Lincoln, Neb., was on the brief, for intervenor American Beef Packers, Inc.
 
 
 2
 Mr. Irving M. King, Chicago, Ill., with whom Messrs. Eugene Cotton and Richard F. Watt, Chicago, Ill., were on the brief, for intervenor Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, Local Union No. 641.
 
 
 3
 Before BAZELON, Chief Judge, and TAMM, Circuit Judge, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.
 
 MATTHEWS, Senior District Judge:
 
 4
 In a petition filed by Arthur L. Morgan Union, Local No. 3 (hereafter Morgan Union), we are asked to review an order[1] of the National Labor Relations Board dismissing a complaint charging American Beef Packers, Inc. (hereafter referred to as the Corporation) with violations of the National Labor Relations Act.[2] The Trial Examiner held that the Corporation violated Sec. 8(a) (1) and (2) of the Act by entering into a collective bargaining agreement with Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, Local Union No. 641 (hereafter Amalgamated), at a time when that Union did not represent a majority of the Corporation's employees in the appropriate bargaining unit.
 
 
 5
 The Board, disagreeing with the Trial Examiner, held that the General Counsel failed to carry his burden of proof as to the minority status of Amalgamated.[3]
 
 
 6
 Our task is to determine whether on the record as a whole, including the findings of the Trial Examiner, there is substantial evidence to support the Board's findings. Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 7
 In the proceedings before the Trial Examiner there was no direct evidence of the minority status of Amalgamated. To sustain his finding that the General Counsel had made out a prima facie case the Examiner relied on inferences he drew from evidentiary facts. The Board deemed such evidentiary facts insufficient to support the Examiner's finding. The disagreement between the Board and the Examiner does not involve any assessment of credibility.
 
 
 8
 In all, three witnesses were heard by the Trial Examiner. Each was called by the General Counsel.
 
 
 9
 The first witness was Mahmound Amoura, personnel director of the plants of the Corporation, including the one located at Fort Morgan, Colorado, and involved in this case. The responsibility for labor relations in the plants rested upon Mr. Amoura. He was hired in late August 1969 just prior to the opening of the Fort Morgan plant in September 1969 following its sale, closing, and remodeling.
 
 
 10
 Although "newly hired", Mr. Amoura entered into negotiations for a collective bargaining agreement with Amalgamated's representatives early in September 1969 after they informed the Corporation's President, Frank West, that Amalgamated "had a majority of the cards." Most if not all of the negotiations were conducted at places other than Fort Morgan.
 
 
 11
 In bargaining sessions prior to September 19, 1969, there were discussions of a form-agreement containing a recognition clause and articles covering such matters as hours of work, wages, holidays, vacations, leaves of absence, seniority, adjustment of grievances, check off, union security, and the term of the agreement. During one of these sessions Mr. Amoura asked Amalgamated's representative to furnish evidence of majority status, and the representative responded that he "would bring it next time."
 
 
 12
 On September 19, 1969 the formagreement was signed but, according to Mr. Amoura, the representative of Amalgamated "didn't think we would have the contract signed at that time" and "did not bring" with him the requested evidence of majority status. There was in the form-agreement a space for inserting a date from which the document was to "become effective and remain in full force" but the space was left blank, no date being included at the time of the signing.[4]
 
 
 13
 When following such signing the evidence of majority representation was not forthcoming, the Corporation declined to implement the agreement in any way or to recognize Amalgamated as the representative of its Fort Morgan employees. In this situation Amalgamated petitioned the Board for a representation election and turned in to the Board all the authorization cards it had obtained. However, the requested election was blocked when Morgan Union interposed the charges above related.
 
 
 14
 Mr. Amoura testified that he did not know the number of employees in the subject plant at the time of any of the bargaining sessions or on September 19, 1969, the date the form-agreement was signed. Invited by counsel for the General Counsel to "guess" the number of employees the plant had on September 19, 1969, Mr. Amoura's "guess" was 150. He also "guessed" that the first time he came to Fort Morgan was in November 1969.
 
 
 15
 The second witness at the hearing before the Trial Examiner was Alvin H. Tucker, President of Amalgamated and one of its representatives in the negotiating sessions with Mr. Amoura.
 
 
 16
 When questioned as to how many employees the corporation had at the subject plant at the time of the first negotiating session Mr. Tucker said that his "best approximation at that time would have been around 80 to 100." After stating that he did not know how many authorization cards he had at that time he was asked to state approximately how many. He answered: "I'd say approximately 40 to 50."
 
 
 17
 Further testifying, Mr. Tucker said that after the first negotiating session the Union continued its solicitation of Fort Morgan employees and did obtain additional cards. However, he was not asked how many cards Amalgamated had at the time of any of the negotiating sessions subsequent to the first.
 
 
 18
 The third and last witness was Willard Ferson, a representative of Amalgamated. His testimony did not include any evidence as to the number of employees in the appropriate bargaining unit or the number of signed authorization cards obtained by Amalgamated on or prior to September 19, 1969.
 
 
 19
 With a view to defending itself against the unfair labor practices charged by Morgan Union, the Corporation sought to have produced before the Trial Examiner the authorization cards which Amalgamated had filed with the Board in connection with its representation petition for a Board election. By the dates on such cards it was claimed that the number of employees signing the cards on or before September 19, 1971, could be ascertained. But the General Counsel refused to produce the cards. The Corporation's subpoena for the cards was revoked by the Trial Examiner and the Board denied the Corporation request for enforcement of the subpoena.[5]
 
 
 20
 No party undertook to introduce payroll records or other documentary evidence to establish the number of employees who were employed in the appropriate unit on any of the dates on which negotiating meetings were held.
 
 
 21
 The Trial Examiner concluded that the lack of majority on the part of Amalgamated is a fact to be concluded from a combination of circumstances and inferences. These include the brief time lapse between the commencement of the Amalgamated organizational campaign and the grant of recognition; the failure of Amalgamated representatives during the bargaining sessions and prior to the execution of the contract with Respondent's bargaining representative, Mike Amoura, ever to proffer signed authorization cards for his inspection; the accompanying failure of Amalgamated, prior to the grant of recognition, ever to lodge with Amoura an affirmative claim of majority; the post-recognition efforts of Amalgamated to obtain additional signed authorization cards; and the failure of Amalgamated ever to seek enforcement of the collective-bargaining agreement which it had signed, by filing unfair labor practice charges with the Board.
 
 
 22
 Accordingly the Trial Examiner found "in agreement with the General Counsel, that the evidence of record is sufficient to establish, prima facie, the absence of majority status on the part of the Union on or before September 19."
 
 
 23
 Contrary to the finding of the Trial Examiner, the Board found that the General Counsel completely failed to prove the number of employees who had authorized Amalgamated at the relevant times to represent them or the number of employees in the appropriate unit.[6]
 
 
 24
 *****
 
 
 25
 * * *
 
 
 26
 In determining the issue of substantiality of evidence to support the findings of the Board under Sec. 10(f) of the Act, 29 U.S.C. Sec. 160(f), we have considered the record in its entirety. We agree that the findings of the Board are supported by substantial evidence, and we perceive no basis for judicial intervention.
 
 
 27
 We note the argument of the Morgan Union that this case should be remanded to the Board for the purpose of an examination of the heretofore unviewed authorization cards. We do not reach the questions raised in the Board proceedings as to the production of these cards. The present record is deficient not only with respect to the number of employees who designated Amalgamated, but also with regard to the size of the appropriate unit on the relevant dates.[7]
 
 
 28
 The petition for review is denied. The Board's order dismissing the complaint is
 
 
 29
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(c) (1970)
 
 
 [1]
 187 NLRB No. 135
 
 
 [2]
 29 U.S.C. Sec. 151 et seq
 
 
 [3]
 The burden of proving a violation of the National Labor Relations Act rests upon the Board's General Counsel. Cedar Rapids Block Company v. N.L.R.B., 332 F. 2d 880 at 885 (8th Cir., 1964)
 
 
 [4]
 The agreement at the time it was introduced in evidence at the hearing had the date (Sept. 19, 1969) filled in. But it is without dispute in the evidence that at the time of signing, no dates had been inserted. How or when the dates were incorporated is not revealed in the record
 
 
 [5]
 The revocation of the subpoena by the Trial Examiner was based on Board Rule Sec. 102.118 which requires the approval of the General Counsel before documents in his possession can be subpoenaed. The Corporation claimed that these cards would have provided the best evidence on the issue of minority status and that there is no statutory authority for the mentioned Rule. In its brief here the Board argues that the cards had been submitted to the Board solely in connection with a still pending representation election, that as such they were viewed as strictly confidential, and that their public disclosure could subject the signers to harassment or pressures from the employer or a rival union
 
 
 [6]
 The Board said in part:
 [W]hile the General Counsel had in its possession authorization cards at the hearing, it took the position that its affirmative burden under the allegations of the complaint did not require it to undertake by use of authorization cards, or other similar evidence of union affinity or affiliation, to definitively establish the lack of majority status on the part of Amalgamated on the dates critical to the allegations of the complaint.
 * * * The only mention of the number of authorization cards was that in the * * * testimony of Amalgamated's president as to the number of cards at the Omaha meeting before negotiations began, and this in no way constitutes proof that Amalgamated did not represent a majority of the employees at the three subsequent negotiating meetings in Denver. In any event, this testimony was entirely speculative and was only elicited after the witness said he did not know the number. The circumstantial evidence relied on by the Trial Examiner in drawing an inference of lack of majority, amounts to nothing more than conjecture. It is no substitute for proof, which is the General Counsel's burden, that Amalgamated did not in fact represent a majority of Respondent's employees at the relevant times. Accordingly, we shall dismiss the complaint in its entirety.
 
 
 [7]
 Morgan Union also attempts on this appeal to rely upon the Midwest Piping rule. Midwest Piping and Supply Co., 63 N.L. R.B. 1060 (1945); Local 483, Inter. Bro. of Boilermakers, etc. v. N.L.R.B., 109 U.S. App.D.C. 382, 288 F.2d 166, cert. denied, 368 U.S. 832, 82 S.Ct. 55, 7 L.Ed.2d 34 (1961). However, neither the complaint nor the evidence here suggests that the instant case concerns the grant of recognition at a time when two competing unions were involved, and the Trial Examiner expressly rejected such an implication. Accordingly there is no basis for us to apply the Midwest Piping rule